No. 04-247

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 96

MONTANA ENVIRONMENTAL INFORMATION
CENTER and ENVIRONMENTAL DEFENSE,

      Petitioners and Appellants,

   v.

MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY
and BULL MOUNTAIN DEVELOPMENT CO. NO. 1 LLC,

      Respondents and Respondents.

APPEAL FROM:    District Court of the Fourteenth Judicial District,
               In and For the County of Musselshell, Cause No. DV-03-50
               Honorable Richard A. Simonton, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

           Jennifer S. Hendricks; Meloy Trieweiler, Helena, Montana

           George E. Hays, Attorney at Law, San Francisco, California

      For Respondents:

           J. Daniel Hoven, Sara B. Stanton; Browning, Kaleczyc, Berry &
           Hoven, Helena, Montana (for Bull Mountain Development Co.
           No. 1 LLC)

           David M. Rusoff, Special Assistant Attorney General, Department
           of Environmental Quality, Helena, Montana (for Department of
           Environmental Quality)

                      Submitted on Briefs:  December 22, 2004

                               Decided:  April 19, 2005

Filed:          _____
                        Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1      The Montana Environmental Information Center and Environmental Defense (collectively, MEIC) appeal from the judgment entered by the Fourteenth Judicial District Court, Musselshell County, on its order affirming findings of fact, conclusions of law and an order entered by the Montana Board of Environmental Review (the Board). In its order, the Board approved the decision of the Montana Department of Environmental Quality (the Department) to issue an air quality permit to Bull Mountain Development Co. No. 1 LLC (Bull Mountain). We affirm in part, reverse in part and remand for further proceedings consistent with this opinion.

¶2      Although MEIC raises seven issues in its appeal of the District Court's order, we need address only the following:

¶3      1. Did the District Court err in determining the Board correctly concluded that MEIC had the burden of proof in the contested case proceeding?

¶4      2. Did the District Court err in determining the Board applied the correct standards in the contested case proceeding?

¶5      3. Did the District Court err in determining the Board correctly concluded that federal land managers have responsibility to protect visibility in Class I areas and, therefore, the Department appropriately deferred to the federal land managers' conclusions regarding visibility impacts in those areas?

FACTUAL AND PROCEDURAL BACKGROUND

2

¶6    This case stems from a proposal by Bull Mountain to build a 780 megawatt pulverized coal-fired power plant in Musselshell County, approximately 12 miles southeast of Roundup, Montana. The plant would use coal from the Bull Mountain Mine, located adjacent to the site for the proposed plant, as fuel for two boilers to produce steam which would power turbine generators and produce electricity.

¶7    In January of 2002, Bull Mountain submitted an air quality permit application for the proposed power plant to the Department as required by § 75-2-211, MCA, and the administrative rules promulgated thereunder. Bull Mountain also published notice of its application in various local newspapers. After Bull Mountain provided supplementary information, the Department deemed the application complete in July of 2002. The Department issued a draft permit in August of 2002 and a draft environmental impact statement (EIS) the following November. The Department provided for public comment periods on the application, the draft permit and the draft EIS. In early January of 2003, the Department issued its final EIS and, later that month, issued its decision proposing that the air quality permit be granted with conditions.

¶8    MEIC timely requested a hearing before the Board pursuant to § 75-2-211(10), MCA, challenging the Department's decision to grant Bull Mountain an air quality permit for the proposed power plant. MEIC asserted that both Bull Mountain's application and the Department's decision to grant the permit suffered from various procedural and substantive deficiencies. The Board held a contested case hearing pursuant to the Montana Administrative Procedure Act (MAPA) and issued findings of fact, conclusions of law and an order

3

approving the Department's decision to grant the permit. MEIC then petitioned for judicial

review of the Board's order. The District Court affirmed the Board's findings of fact,

conclusions of law and order. MEIC appeals.

## STANDARD OF REVIEW

¶9      A district court reviews a decision in a MAPA contested case proceeding pursuant to

§ 2-4-704, MCA, which provides as follows:

> (1) The review must be conducted by the court without a jury and must be confined to the record. In cases of alleged irregularities in procedure before the agency not shown in the record, proof of the irregularities may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs.
>
> (2) The court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because:
>
> (a) the administrative findings, inferences, conclusions, or decisions are:
>
> (i) in violation of constitutional or statutory provisions;
>
> (ii) in excess of the statutory authority of the agency;
>
> (iii) made upon unlawful procedure;
>
> (iv) affected by other error of law;
>
> (v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;
>
> (vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

4

(b) findings of fact, upon issues essential to the decision, were not made although requested.

We employ this same standard when reviewing a district court's order affirming or reversing an administrative decision. Juro's United Drug v. Public Health, 2004 MT 117, ¶ 9, 321 Mont. 167, ¶ 9, 90 P.3d 388, ¶ 9.

## DISCUSSION

¶10    1. Did the District Court err in determining the Board correctly concluded that MEIC had the burden of proof in the contested case proceeding?

¶11    During the contested case proceeding before the Board, the question arose regarding which party had the burden of proving that the air quality permit should or should not be issued to Bull Mountain. The Board determined that, as the party challenging issuance of the permit, MEIC had the burden of proof. MEIC challenged this determination in its petition for judicial review. The District Court concluded that the Board correctly determined that MEIC had the burden of proof. MEIC asserts error.

¶12    MEIC asserts that, when Bull Mountain applied for the air quality permit, Bull Mountain had the burden of proving to the Department that all statutory and regulatory criteria for issuance of the permit were satisfied. From that premise, MEIC contends that Bull Mountain's initial burden of proof in this regard extended to the contested case hearing before the Board and required Bull Mountain--as well as the Department--to establish that the application met the permit criteria. Bull Mountain and the Department respond that MEIC, as the party contesting the decision to issue the permit, had the burden of proving to the Board that the application did not meet the permit criteria.

5

¶13    As stated above, MEIC challenged the Department's decision to issue the air quality permit by requesting a hearing before the Board pursuant to § 75-2-211(10), MCA.  Section 75-2-211(10), MCA, provides that "a person who is jointly or severally adversely affected by the department's decision may request a hearing before the board," and that the contested case provisions of the MAPA apply to hearings before the Board.  Under the contested case provisions of the MAPA, all parties to such a proceeding must be afforded the opportunity to respond and present evidence and argument on the issues raised.  Section 2-4-612(1), MCA.  Furthermore, contested case hearings are bound by the common law and statutory rules of evidence unless otherwise provided by a specific statute.  Section 2-4-612(2), MCA. The parties do not contend that any statute relating directly to the Department or the Board provides for alternative evidentiary rules in a hearing before the Board.  Consequently, Montana's general common law and statutory rules of evidence apply to a contested case hearing before the Board under § 75-2-211(10), MCA.

¶14    The statutory evidentiary provisions pertinent to this issue state that "[t]he initial burden of producing evidence as to a particular fact is on the party who would be defeated if no evidence were given on either side[;]" in addition, "a party has the burden of persuasion as to each fact the existence or nonexistence of which is essential to the claim for relief or defense he is asserting."  Sections 26-1-401 and -402, MCA.  Thus, the party asserting a claim for relief bears the burden of producing evidence in support of that claim.  Wright Oil & Tire Co. v. Goodrich (1997), 284 Mont. 6, 11, 942 P.2d 128, 131.

6

¶15 Here, MEIC challenged the Department's decision to issue an air quality permit to Bull Mountain by requesting a contested case hearing before the Board. MEIC filed a petition and affidavit with the Board alleging that the Department approved the permit in violation of Montana statutes and administrative regulations, and requesting the following relief: 1) that the Board order a contested case hearing to determine the validity of the permit; 2) that the Board stay the Department's decision to grant the permit pending the hearing and final decision; 3) that the Board vacate and remand the decision to issue the permit pending compliance with all applicable laws and regulations; and 3) that the Board provide any and all other relief it may deem appropriate.

¶16 The claim MEIC asserted before the Board was that the Department's decision to issue the air quality permit violated Montana law. If no challenge had been made or, as in this case, no evidence were presented at the contested case hearing establishing that issuance of the permit violated the law, the Board would have no basis on which to determine the Department's decision was legally invalid. Thus, as the party asserting the claim at issue, MEIC had the burden of presenting the evidence necessary to establish the facts essential to a determination that the Department's decision violated the law. See §§ 26-1-401 and -402, MCA. We hold, therefore, that the District Court did not err in determining the Board correctly concluded that MEIC had the burden of proof in the contested case proceeding.

¶17 2. Did the District Court err in determining the Board applied the correct standards in the contested case proceeding?

7

¶18     In its petition and affidavit filed with the Board challenging the Department's decision

to issue the air quality permit, MEIC alleged numerous procedural and substantive errors

regarding the issuance of the permit.  MEIC's petition set forth each allegation of error in

separate subsections and asserted with regard to each error that the Department's act or

omission was clearly erroneous, arbitrary and capricious, and an abuse of discretion.  Prior

to the contested case hearing, the question arose as to the Board's proper role in addressing

the Department's decision and MEIC's asserted claims of error.  MEIC contended that,

notwithstanding the clearly erroneous/arbitrary and capricious/abuse of discretion language

used in its petition, the Board was to act as a finder of fact and make legal determinations

based on the preponderance of the evidence presented.  The Department and Bull Mountain

asserted that the Board should review the Department's decision with deference to the

Department's expertise in the subject matter.

¶19     At the beginning of the hearing, the attorney advising the Board as to procedural and

evidentiary matters presented a memorandum regarding the standards the Board should use

in the proceeding.  The opening paragraph of the memorandum stated as follows:

> Under the Montana Administrative Procedure Act, the standards for court
> review of agency decisions are in MCA § 2-4-704(2).  The Board should apply
> the same standards when hearing a challenge to a decision made by [the
> Department], to the extent that the standards are applicable to the Board.

The memorandum then generally referred to the standards set forth in subsections (i) through

(iv) of § 2-4-704(2), MCA.  With regard to the standards provided in § 2-4-704(2)(v) and

(vi), MCA, the memorandum provided specific definitions of the terms "clearly erroneous,"

8

"arbitrary," "capricious" and "abuse of discretion." Additionally, at the beginning of the Board's deliberations after the hearing, the Board's attorney again mentioned his earlier memorandum and advised the Board that

> these are the standards used by a court review of agency decisions. So if the decisions made by this Board were to be reviewed by a court, the court would apply those standards to the Board's decisions. When the Board looks, then, at what [the Department] did, at a minimum, [the Department's] actions have to fit those standards to be sustained.

The attorney also advised the Board that it had the power to enter findings of fact based on a preponderance of the evidence and that, as to MEIC's allegations that the Department's actions were clearly erroneous, arbitrary and capricious or an abuse of discretion, "the question is, did the petitioners, by a preponderance of the evidence, establish that the decision was arbitrary and capricious?"

¶20 The Board subsequently issued its findings of fact, conclusions of law and order which generally affirmed, with modifications, the Department's determination to issue the air quality permit. The Board's decision addressed each allegation contained in MEIC's petition separately. As to each allegation, the Board made findings of fact based on a preponderance of the evidence presented to it at the contested case hearing, a conclusion of law based on those findings and an ultimate decision--based on the findings and conclusion--regarding the allegation at issue. However, as stated above, certain of the allegations in MEIC's petition to the Board asserted that the Department's actions were "clearly erroneous, arbitrary and capricious, and an abuse of discretion." Regarding those allegations, the Board entered findings of fact stating that "[t]he Board finds, by the preponderance of the evidence,

9

that the conduct of the Department . . . was not clearly erroneous, arbitrary and capricious, and an abuse of discretion."

¶21 In petitioning the District Court for judicial review, MEIC contended the Board erred by utilizing incorrect standards when it determined whether the Department's decision was clearly erroneous, arbitrary or capricious, or an abuse of discretion. The District Court concluded that "it would seem that the Board's role in determining whether a permit should be issued would not be de novo, but would be to review a decision of the experts [the Department] to determine if there is substantial evidence to support its decision." The court further concluded that the standards stated by the Board's attorney were the appropriate standards for the Board to apply in reviewing a Department decision. MEIC asserts the District Court's conclusions are erroneous.

¶22 As stated above, a party adversely affected by a Department decision approving or denying an air quality permit may request a hearing before the Board to be conducted pursuant to the contested case provisions of the MAPA. Section 75-2-211(10), MCA. The contested case provisions of the MAPA are contained in Title 2, chapter 4, part 6 of the Montana Code Annotated (MCA). Under those provisions, all parties shall be given opportunity to appear and present evidence and argument regarding all the issues raised in the proceeding. Section 2-4-612(1), MCA. Additionally, § 2-4-623, MCA, provides, in pertinent part, as follows:

> (1) A final decision or order adverse to a party in a contested case shall be in writing or stated in the record. A final decision shall include findings of fact and conclusions of law, separately stated. Findings of fact, if set forth in

10

statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

(2) Findings of fact shall be based exclusively on the evidence and on matters officially noticed.

(3) Each conclusion of law shall be supported by authority or by a reasoned opinion.

Furthermore, findings of fact in a civil matter must be based on a preponderance of the evidence. Section 26-1-403(1), MCA. Thus, the Board's role in the contested case proceeding was to receive evidence from the parties, enter findings of fact based on the preponderance of the evidence presented and then enter conclusions of law based on those findings.

¶23 In contrast, Title 2, chapter 4, part 7 of the MCA provides for judicial review by a district court of an agency decision in a contested case proceeding under the MAPA. As set forth above, a district court reviews a final agency decision in a contested case proceeding pursuant to § 2-4-704, MCA. Pursuant to this statute, a district court may determine whether an agency decision is clearly erroneous, arbitrary and capricious, or an abuse of discretion. See § 2-4-704(2)(v) and (vi), MCA. These standards of review are expressly limited to a district court's review of an agency decision under part 7 of the MAPA. The standards of clearly erroneous, arbitrary and capricious, and abuse of discretion are not available to an agency acting as a factfinder under the contested case provisions contained in part 6 of the MAPA.

11

¶24    Situations exist in which an administrative body acts in an appellate capacity when reviewing decisions, acting outside the purview of the MAPA contested case provisions and using a deferential standard of review. For example, administrative regulations governing school controversies provide that a decision of a local school board of trustees may be appealed to the county superintendent. See Rule 10.6.103, ARM. The county superintendent conducts an evidentiary hearing and enters a written final order containing findings of fact and conclusions of law. Rules 10.6.116 and 10.6.119, ARM. A party aggrieved by the county superintendent's final order then may appeal to the state superintendent of public instruction. Rule 10.6.121(3), ARM. The state superintendent reviews the county superintendent's decision in an appellate capacity, confined to the record established at the hearing before the county superintendent and applying a standard of review substantially similar to that applied by a district court in judicial review of a contested case under § 2-4-704(2), MCA, of the MAPA. Rules 10.6.121 and 10.6.125, ARM.

¶25    In the present case, however, § 75-2-211(10), MCA, expressly states that the hearing before the Board must be conducted pursuant to the contested case provisions of part 6 of the MAPA. To that end, the Board entered findings of fact based on the evidence presented and conclusions of law based on those findings. However, as to certain of MEIC's allegations, the Board determined that the Department's actions were not clearly erroneous, arbitrary or capricious, or an abuse of discretion. In making these latter findings, the Board responded to the language utilized in MEIC's petition, and also relied on the imprecise advice of the Board's attorney regarding its role vis-a-vis the Department's decision. It is

12

clear, however, that the Board applied a standard of review not legally available to it as the finder of fact in a contested case proceeding pursuant to the MAPA.

¶26    We conclude, therefore, that the District Court erred in determining the Board applied the correct standards in the contested case proceeding.  We further conclude that this case must be remanded to the District Court with instructions to remand to the Board for entry of new findings of fact and conclusions of law in conformity with part 6 of the MAPA.  In entering new findings of fact and conclusions of law, the Board may, in its discretion, rely entirely on the record before it or receive additional evidence on such matters as it may deem appropriate.

¶27    3. Did the District Court err in determining the Board correctly concluded that federal land managers have responsibility to protect visibility in Class I areas and, therefore, the Department appropriately deferred to the federal land managers' conclusions regarding visibility impacts in those areas?

¶28    Department regulations require an applicant for an air quality permit to include in the application information regarding the types of pollutants the proposed project is predicted to emit, the predicted rates of such emissions and proposed methods of controlling the emissions.  The regulations also require a permit applicant to provide a visibility analysis demonstrating that the predicted emissions will not cause or contribute to an adverse impact on visibility in any area designated as a Class I area.  See Rule 17.8.1106, ARM.  The effect of emissions on visibility in Class I areas must be estimated using an approved computer air quality dispersion modeling program.  Rule 17.8.1107, ARM.  The Department may not

issue an air quality permit unless the applicant demonstrates that there will be no resulting adverse impact on visibility in Class I areas. Rules 17.8.1106(1) and 17.8.1109(2), ARM.

¶29 If, upon initial review of the application, the Department determines that a proposed project will or may impact on visibility in a Class I area, the Department must provide notice of the anticipated visibility impact to the environmental protection agency (EPA) and to the federal land manager (FLM) charged with direct responsibility for the management of the Class I area involved. Rule 17.8.1108, ARM.

> The [FLM] and the federal official charged with direct responsibility for management of Class I lands have an affirmative responsibility to protect the air quality related values (including visibility) of any such lands and to consider . . . whether a proposed source or modification would have an adverse impact on such values.

Rule 17.8.825(2), ARM.

¶30 Upon receiving the Department's notice, the FLM may present the Department with a demonstration that emissions from the proposed project will adversely impact the visibility of the Class I area at issue. Rules 17.8.825(3) and 17.8.1109(1), ARM. If the FLM determines that such an adverse impact on visibility will result, then

> [t]he [applicant] may demonstrate to the [FLM] that the emissions from such source would have no adverse impact on the air quality-related values of such lands (including visibility) . . . . If the [FLM] concurs with such demonstration and so certifies to the department, the department may, provided that applicable requirements are otherwise met, issue the permit . . . .

Rule 17.8.825(4), ARM. Rule 17.8.1109, ARM, further provides that

> (2) The department will consider the comments of the [FLM] in its determination of whether adverse impact on visibility may result. Should the

department determine that such impairment may result, a permit for the proposed source will not be granted.

(3) Where the department finds [the FLM's] analysis does not demonstrate to the satisfaction of the department that an adverse impact on visibility will result, the department will provide written notification to the affected [FLM] within five days of the department's final decision on the permit. The notification will include an explanation of the department's decision or give notice as to where the explanation can be obtained.

¶31 In its application, Bull Mountain identified four Class I areas within which visibility potentially could be impacted by emissions from the proposed plant: Yellowstone National Park (Yellowstone), the UL Bend Wilderness area (UL Bend), the North Absaroka Wilderness area (North Absaroka) and the Northern Cheyenne Indian Reservation (NCIR). In conducting its visibility analysis, Bull Mountain used a computer modeling program called CALPUFF to estimate whether, and to what extent, visibility impacts would occur in those areas. The CALPUFF modeling revealed that visibility impacts would occur in varying degrees in each of the four areas. Consequently, the Department notified the EPA; the United States Department of Agriculture Forest Service (Forest Service), the FLM for North Absaroka; the United States Department of Interior for Fish, Wildlife and Parks (FWP), the FLM for Yellowstone and UL Bend; and the NCIR of the potential visibility impacts resulting from emissions from the proposed project.

¶32 The Forest Service did not respond to the notification on behalf of North Absaroka. The NCIR submitted comments concerning visibility impairment on the reservation resulting from the proposed project, but did not provide data or analysis demonstrating that emissions would or would not cause or contribute to an adverse impact on visibility as contemplated

15

by Rules 17.8.825(3) and 17.8.1109(1), ARM. The FWP responded with a letter to the Department stating that the FWP had conducted its own computer modeling analysis and concluded that emissions from the proposed project would have an adverse impact on visibility in Yellowstone and UL Bend on a significant number of days in a year. The FWP appended documentation of its computer modeling analysis to the letter. The FWP also observed that, although it was not the FLM for North Absaroka or the NCIR, its computer modeling analysis included those areas for completeness and determined there would be adverse visibility impacts in those areas as well.

¶33 In response the FWP letter, Bull Mountain conducted an additional visibility analysis using weather data specific to the Yellowstone area. This analysis determined that, on the majority of the days on which the FWP asserted the proposed project would adversely impact visibility in Yellowstone, there were weather conditions such as rain, snow or fog which would cause visibility impairment naturally. As a result, according to Bull Mountain, any adverse visibility impact from the proposed project would be obscured by the natural weather conditions and be imperceptible to Yellowstone visitors. In other words, Bull Mountain asserted that, on the majority of those days, the proposed project would not cause or contribute to an adverse impact on visibility in Yellowstone. Bull Mountain also observed that it could not conduct a similar analysis for the UL Bend area because there was no historical weather data available, but indicated it was "likely" that such natural visibility impairment also would occur in that area. Bull Mountain provided documentation of its additional visibility analysis in Yellowstone to the Department and the FWP.

16

¶34 After receiving Bull Mountain's additional visibility analysis, the FWP withdrew its initial adverse visibility impact determination for Yellowstone and UL Bend. In its subsequent decision to issue Bull Mountain an air quality permit, the Department observed that the FLMs initially indicated the proposed project's emissions would lead to an adverse impact on visibility in nearby Class I areas, but that "the FLMs withdrew their determination that an adverse impact would result from" the proposed project. Thus, although not expressly stated in its decision, the Department implicitly determined that emissions from Bull Mountain's proposed project would not "cause or contribute to adverse impact on visibility" in nearby Class I areas. See Rules 17.8.1106(1) and 17.8.1109(2), ARM.

¶35 At the hearing before the Board, MEIC asserted that the Department improperly deferred to the FWP's opinion regarding visibility impacts rather than reaching its own independent assessment of whether the proposed project's emissions would result in visibility impacts. The Board determined that, by law, FLMs have responsibility to protect visibility in Class I areas and the Department properly relied on the FWP's opinion that the proposed project would not adversely impact visibility in those areas. MEIC challenged this determination in its petition for judicial review by the District Court. The District Court concluded as follows:

> [FLMs] determined the impact on visibility at Yellowstone National Park, UL Bend Wilderness Area, and Northern Absaroka Wilderness Area, or the closest areas where dat[a] are available. They are the experts upon which [the Department] relies and they are the ones responsible for determining impacts on federal lands. With the exception of the initial report on Yellowstone National Park, the FLMs did not find adverse air quality impacts that would preclude the project. After review of the data on Yellowstone National Park,

17

the initial adverse report was amended. The Board spent considerable time receiving testimony and other evidence, appeared to carefully review it, and its conclusions are not arbitrary, capricious, or an abuse of discretion.

MEIC asserts the court's conclusion that the Department properly relied on, and deferred to, the FLM opinion is erroneous. We agree.

¶36 Bull Mountain and the Department correctly observe that FLMs are charged with the responsibility for management of Class I areas and have an affirmative responsibility to protect the air quality-related values of those areas by, in part, considering whether a proposed project would have an adverse impact on visibility. See Rule 17.8.825(2), ARM. However, the Department is precluded from issuing an air quality permit unless the applicant affirmatively demonstrates to it that the proposed project will not cause or contribute to an adverse impact on visibility in Class I areas. See Rules 17.8.1106(1) and 17.8.1109(2), ARM. Moreover, as set forth above, Rule 17.8.1109, ARM, provides that

> (2) The department will consider the comments of the [FLM] in its determination of whether adverse impact on visibility may result. Should the department determine that such impairment may result, a permit for the proposed source will not be granted.

> (3) Where the department finds [the FLM's] analysis does not demonstrate to the satisfaction of the department than an adverse impact on visibility will result, the department will provide written notification to the affected [FLM] within five days of the department's final decision on the permit. The notification will include an explanation of the department's decision or give notice as to where the explanation can be obtained. [Emphasis added.]

¶37 Thus, while FLMs' opinions and analyses regarding adverse visibility impacts on Class I areas carries weight in the overall determination of whether an applicant has established that a proposed project's emissions will not cause such adverse impacts, the

18

Department's own regulations require it to make its own independent determination on the issue by considering all the information presented to it. The Department may not simply defer to the opinion of the relevant FLMs.

¶38 We hold, therefore, that although the Board correctly concluded that FLMs have responsibility to protect visibility in Class I areas, the District Court erred in determining the Department appropriately deferred to the FLMs' conclusions regarding visibility impacts in those Class I areas potentially impacted by emissions from the proposed project. Thus, on remand the Board shall enter findings of fact and conclusions of law determining whether, based on all the evidence presented, Bull Mountain established that emissions from its proposed project will not cause or contribute to adverse impact on visibility in the Class I areas at issue.

¶39 Affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.


/S/ KARLA M. GRAY


We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER

19