# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 16, 2005                    Decided July 1, 2005

No. 04-5327

NATIONAL PARKS CONSERVATION ASSOCIATION, ET AL.,
APPELLANTS

v.

CRAIG MANSON, IN HIS OFFICIAL CAPACITY AS
ASSISTANT SECRETARY OF INTERIOR, FISH AND WILDLIFE
AND PARKS, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(03cv02330)

———

*Abigail M. Dillen* argued the cause for appellants. On the briefs were *Timothy J. Preso* and *Douglas L. Honnold.*

*Kathryn E. Kovacs*, Attorney, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *David C. Shilton* and *Eric G. Hostetler*, Attorneys.

Before: SENTELLE, RANDOLPH, and GARLAND, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: The Bull Mountain Power Company sought permission from a state agency to construct a coal-fired, electric generating plant in Roundup, Montana, in the vicinity of Yellowstone National Park and a federal wilderness area. The state agency issued a permit after receiving a letter from an official of the Department of the Interior stating that the power plant would not adversely affect visibility in Yellowstone Park or the wilderness area. The National Parks Conservation Association and other environmental conservation organizations ("National Parks") sued in district court, claiming that the Interior Department violated the Clean Air Act, 42 U.S.C. §§ 7401-7671q. The district court dismissed the suit on the ground that plaintiffs lacked standing. We reverse.

I.

The proposed Roundup Plant lies between Yellowstone National Park and the UL Bend Wilderness Area. Its proximity to protected federal lands triggered the Prevention of Significant Deterioration provisions of the Clean Air Act. Under these provisions, which were designed "to preserve, protect, and enhance the air quality in national parks [and] national wilderness areas," 42 U.S.C. § 7470(2), (3), EPA must forward proposals for the construction of "major emitting facilities" to the "Federal Land Manager" and to the "Federal official" responsible for the areas potentially affected. 42 U.S.C. § 7475(d)(1), (2)(A). The National Park Service manages Yellowstone. The U.S. Fish and Wildlife Service is responsible for the UL Bend Wilderness Area. They are the Federal Land Managers in this case. The federal official with oversight over both bodies is the Secretary of the Interior.

The Clean Air Act does not give these federal officials authority to issue or reject permit applications. But it charges them with "an affirmative responsibility to protect the air

quality" in the protected areas, and requires them to "consider . . . whether a proposed major emitting facility will have an adverse impact." § 7475(d)(2)(B). The federal officials fulfill these responsibilities by transmitting to the state authority their findings regarding the potential air-quality ramifications of the proposed project. No permit shall issue if "the Federal Land Manager demonstrates to the satisfaction of the State that the emissions from such facility will have an adverse impact on the air quality-related values (including visibility) of such lands." § 7475(d)(2)(C)(ii). Although the state permitting authority thus retains final decision-making authority, a federal impact report is not purely advisory. If the state authority chooses to disregard an adverse impact determination, it must -- in accordance with federal requirements for state implementation plans -- explain its decision in writing and publish the explanation. 40 C.F.R. § 51.307(a)(3); MONT. ADMIN. R. 17.8.1109(3).

The facts of this case are as follows. On January 14, 2002, the Bull Mountain Power Company applied to the Montana Department of Environmental Quality ("DEQ") for a permit for the Roundup Plant. On August 12, the DEQ published a draft permit for public comment, having furnished the National Park Service and U.S. Fish and Wildlife Service notice of the pending application. On December 18, following statistical and modeling analysis, the two Federal Land Managers sent a letter and a report formally notifying the Montana DEQ that the proposed Roundup Plant would "cause perceptible visibility impairment at" Yellowstone and UL Bend.

Two days later, Bull Mountain Power voiced its objection to officials at the Interior Department. The company later submitted written comments, arguing that the original federal analysis was flawed because it failed to take into account weather conditions at Yellowstone. (The comments did not mention UL Bend.) In response, the Department's Air

Resources Division conducted further analysis. This only served to reaffirm the original adverse impact conclusion. On January 7, 2003, Air Resources prepared a letter reiterating the initial determination that the Roundup Plant would adversely affect air quality at Yellowstone and UL Bend. On January 10, Assistant Secretary Manson rejected the proposed staff letter and prepared a new letter, withdrawing the December 18 finding of adverse impact. Despite objections from Air Resources staff, and officials of the National Park Service and the Fish and Wildlife Service, the Assistant Secretary sent the withdrawal letter, which represented the final federal action in the matter. On January 31, relying on Interior's reversal of positions, the Montana DEQ approved the Roundup Plant permit application.

National Parks brought suits challenging the permit in Montana state court and in federal district court. In the federal action it claimed that Assistant Secretary Manson violated the Administrative Procedure Act when he withdrew the initial report without adequately discharging his procedural obligation to "consider" the potential adverse impact on air quality in Yellowstone and UL Bend. 42 U.S.C. § 7475(d)(2)(B). In the state litigation, the Montana Supreme Court ruled in favor of National Parks, vacated the Montana DEQ's issuance of the Roundup Plant permit and ordered the DEQ to revisit its conclusions. *Mont. Envtl. Info. Ctr. v. Mont. Dep't of Envtl. Quality*, 326 Mont. 502 (2005). The permit application is now before the Montana DEQ on remand.

## II.

In order to satisfy Article III's standing requirements, plaintiffs must demonstrate injury-in-fact (concrete and particularized, actual or imminent), caused by the defendant and capable of being redressed by a court order. *Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180-81 (2000); *Lujan v.*

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The district court assumed, without deciding, that National Parks had suffered a cognizable injury. But the court determined that National Parks had not satisfied the two other standing requirements and entered a judgment dismissing the action, a judgment we review *de novo. Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004).

## A.

National Parks' complaint alleged that its members regularly use and enjoy Yellowstone and UL Bend. It claims to have suffered a "procedural injury" from the Assistant Secretary's failure to conduct a reasoned determination regarding the proposed plant's impact on air quality in these areas. Interior does not deny that National Parks has alleged an injury, but it takes issue with the proper characterization of that injury, arguing that National Parks' claim is simply a challenge to the substance of Interior's action. Regardless whether the alleged injury is procedural or direct, it satisfies the first aspect of the standing test. As an organization dedicated to the conservation of, and whose members make use of, public lands, National Parks suffers a cognizable injury from environmental damage to those lands. *See Sierra Club v. Morton*, 405 U.S. 727, 734 (1972). In the alternative, if the Assistant Secretary's alleged inadequate consideration of air quality constitutes a procedural injury, this would "cause a distinct risk to a particularized interest of the plaintiff" -- that is, conservation of those public lands plaintiffs' members use. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc); *see also Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 51 (D.C. Cir. 1999).

The procedural-substantive distinction may still seem to be important because "'[p]rocedural rights are special': The person

who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. "A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result." *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002). Thus, if we have before us a procedural injury, this would appear to affect our analysis of causation and redressability. But this case does not quite fit into the mold of the major procedural rights standing cases. The hypothetical in footnote 7 of *Lujan* represents the archetypal procedural injury: an agency's failure to prepare a statutorily required environmental impact statement before taking action with potential adverse consequences to the environment. *Id.* Our decision in *Florida Audubon* involved a similar fact pattern. 94 F.3d at 662-63. A common element in those cases is that the same actor was responsible for the procedural defect and the injurious final agency action. Under those circumstances, the case law relieves the plaintiff of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) that court-ordered compliance with the procedure would alter the final result. *Lujan*, 504 U.S. at 572 n.7.

In this case the ultimate source of injury is two steps removed from the alleged procedural defect. There is the intra-federal link between the Assistant Secretary's alleged failure to consider air quality impact and his decision to withdraw the adverse impact letter, and there is the federal-state link between withdrawal of the impact report and the Montana DEQ's decision to approve the Roundup Plant permit. The relaxation of procedural standing requirements would excuse National

Parks from having to prove the causal relationship regarding the Interior Department's action, but its burden regarding the action of the Montana authorities would not change. *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005) ("[T]his Court assumes the causal relationship between the procedural defect and the final agency action. Nonetheless, [plaintiffs] still must demonstrate a causal relationship between the final action and the alleged injuries.").

If the claim is that Interior's withdrawal of its adverse impact letter was arbitrary and capricious, then we need only concern ourselves with the connection between the federal action and the outcome of the permitting process in Montana. On the other hand, if the claim should be viewed as a procedural injury, we need not inquire into whether the procedural defect influenced the final action of the Interior Department. Either option leaves us in essentially the same place. Regardless whether National Parks' injury is procedural or substantive in nature, the question of standing must turn on the strength of the link between Interior's action and the ultimate permitting decision of the Montana DEQ.

### B.

To satisfy the causation requirement of Article III standing, National Parks had to show a causal link between Interior's withdrawal of its adverse impact letter and the Montana DEQ's decision to issue the power plant permit. *See Nat'l Wrestling Coaches*, 366 F.3d at 938 (citing *Lujan*, 504 U.S. at 562). A "substantial probability" that Interior's action "created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interests of" National Parks will suffice. *Fla. Audubon*, 94 F.3d at 669.

The Montana DEQ has discretionary authority to conduct an independent evaluation when it receives a federal adverse impact report. MONT. ADMIN. R. 17.8.1109. But in this case it did not do so. Interior's withdrawal of its impact letter was virtually dispositive of the state permitting decision. MONT. DEP'T OF ENVTL. QUALITY, PERMITTING & COMPLIANCE DIV., RECORD OF DECISION FOR ROUNDUP POWER PROJECT, Jan. 31, 2003, *reprinted in* App. 48-49 ("[T]he federal land managers have withdrawn their finding of adverse visibility impact on nearby mandatory federal Class I areas, so DEQ has not determined that an adverse impact on visibility may result from the proposed action."). In addition, federal regulations and the Montana air quality regulations are intertwined such that the challenged federal action "alters the legal regime to which the [local] agency action is subject." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Had Interior not withdrawn its adverse impact report, the Montana DEQ would have been bound to consider that report before proceeding with its permitting decision and, crucially, would have been required to justify its decision in writing if it disagreed with the federal report. MONT. ADMIN. R. 17.8.1109. This regime is not specific to Montana. All states must promulgate rules such as Montana's in order to comply with federal regulations. 40 C.F.R. § 51.307(a)(3) ("Where the State finds that such an analysis does not demonstrate to the satisfaction of the State that an adverse impact will result, . . . the State must, in the notice of public hearing, either explain its decision or give notice as to where the explanation can be obtained.").

The existence of this formal legal relationship undermines Interior's suggested analogy to *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976), which it uses to argue that the Montana DEQ is an independent actor whose intervening action breaks the causal chain. In *Simon* a class of indigents sued the Internal Revenue Service, claiming

that an IRS ruling reduced tax incentives for hospitals offering free health care to indigents, and therefore would result in indigents being deprived of free health care. The Court found this to be too speculative and attenuated a connection between federal agency action and the action of private parties, which IRS could neither anticipate nor control. *Id.* By contrast, when Interior acts in its capacity as Federal Land Manager, the agency exerts legal authority over the Montana DEQ; in determining whether to release an adverse impact report, Interior expects and intends its decision to influence the permitting authority. The Montana DEQ is therefore not the sort of truly independent actor who could destroy the causation required for standing. *Lujan*, 504 U.S. at 560-61; *Simon*, 426 U.S. at 41-42.

## C.

As to redressability, although a federal district court ruling in favor of National Parks would not directly determine whether the Roundup Plant will get its permit, the effect of such a ruling would not be far removed. The permitting decision remains open and pending before the Montana DEQ. The Montana Supreme Court has ordered DEQ to revisit its conclusions regarding the Roundup Plant permit and to determine anew whether "Bull Mountain established that emissions from its proposed project will not cause or contribute to adverse impact on visibility in the Class I areas at issue." *Mont. Envtl. Info. Ctr.*, 326 Mont. 502, at ¶ 38. A district court order setting aside Interior's letter withdrawing its adverse impact determination doubtless would significantly affect these ongoing proceedings. That is enough to satisfy redressability. "A significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered" will suffice for standing. *Utah v. Evans*, 536 U.S. 452, 464 (2002).

We therefore reverse the judgment of the district court dismissing the action for the lack of standing and remand the case for further proceedings.

*So ordered.*